Sophia G. Gold (SBN 307971)
*sgold@kalielgold.com*
Amanda J. Rosenberg (SBN 278507)
*arosenberg@kalielgold.com*
**KALIELGOLD PLLC**
490 43rd Street, No. 122
Oakland, California 94609
Telephone: (202) 350-4783

Jeffrey D. Kaliel (SBN 238293)
*jkaliel@kalielpllc.com*
**KALIELGOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, DC 20005
Telephone: (202) 350-4783

*Attorneys for Plaintiff and the Classes*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL FLOWERS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EXTEND, INC.,<br><br>Defendant. | Case No.: 4:26-cv-01176-HSG<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**(DEMAND FOR JURY TRIAL)**<br><br>Hon. Haywood S. Gilliam, Jr. |

Plaintiff Michael Flowers, on behalf of himself and all others similarly situated, complains and alleges upon information and belief based, among other things, upon the investigation made by Plaintiff and through his attorneys as follows:

## INTRODUCTION

1. This is a proposed class action seeking monetary damages, restitution, and public injunctive and declaratory relief from Defendant Extend, Inc. ("Defendant" or "Extend") arising from its deceptive addition of junk fees to consumers' shopping carts.

2. As discussed in detail herein, the assessment of these fees is deceptive and unfair, since: (a) Extend sneaks these fees into consumers' shopping carts by its widget interface design, which automatically pre-selects the fee and presents it as a mandatory charge late in the checkout flow; (b) Extend confusingly named the add-on fee "Shipping Protection," a label that leads reasonable consumers to believe the charge is required, standard, or inseparable from their purchase rather than an optional commercial add-on; and (c) Extend structured the auto-checked default specifically to generate revenue from consumers who would otherwise not choose to opt-in. Reasonable consumers, like Plaintiff, would not knowingly choose to pay these fees absent Extend's deception.

3. Thousands of e-commerce customers like Plaintiff have been assessed hidden charges for which they did not bargain due to Defendant's deceptive tactics.

4. By designing its widget to auto-select fees and confusingly label them "Shipping Protection," Defendant deceives consumers and gains an unfair upper hand on competitors that fairly present optional add-on charges with honest labels and genuine opt-in mechanisms.

5. Plaintiff seeks damages and, among other remedies, public injunctive relief that fairly allows consumers to decide whether they will pay such fees.

## PARTIES

6. Plaintiff Michael Flowers is a citizen and resident of Madison, Alabama. Plaintiff intends to continue purchasing goods online, including from MidwayUSA and other merchants that may partner with Extend, and faces a real risk of being subjected to Extend's deceptive practices in the future.

7. Defendant is headquartered in San Francisco, California. Extend's officers, product designers, software engineers, and business development personnel are based in San Francisco, California. Extend offers various widgets for e-commerce websites. The key decisions giving rise to

this action—including the decision to design the widget with a pre-selected, auto-added fee; the decision to name that fee "Shipping Protection"; the decision to pressure retailers to retain the pre-check default; and the execution of contracts with e-commerce retailers—were made by Extend's California-based personnel and emanate from California.

## JURISDICTION AND VENUE

8. This Court has original jurisdiction over this action, among other reasons, under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed Class is comprised of at least 100 members; (2) at least one member of the proposed Class resides outside California; and (3) the aggregate claims of putative Class members exceed $5 million, exclusive of interest and costs.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant conducts significant business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District. Defendant is also headquartered within this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### I. The Rise of Extend

10. Extend, Inc. is headquartered in San Francisco, California. Extend's core business is offering services to e-commerce retailers related to shipping, including its purported "Shipping Protection." On information and belief, all material decisions about the design, deployment, and marketing of Extend's Shipping Protection widget were made by Extend's California-based leadership and employees.

11. Extend ingratiates itself with e-commerce retailers by promising to help retailers make more money. For example, Extend promises to "maximize revenue" and "boost profitability."




12. On information and belief, Extend allots a certain percentage of fees paid to the online merchants that integrate the Extend platform. Extend touts, "[i]t's almost like free money for making customers happy."




13. On information and belief, Extend's California-based personnel execute contracts with e-commerce retailers, and all material contractual terms are set by Extend from its California headquarters.

14. But the way in which Extend provides allegedly "free money" to e-commerce retailers is through deception. As described herein, Extend directs e-commerce retailers who use its services to install a widget on its website. On information and belief, that widget adds a hidden, *__pre-selected__* box or toggle that automatically adds junk fees like "Shipping Protection" fees to all

orders. This method of adding on fees is designed to go undetected by consumers and thus provide additional revenue to both Extend and e-commerce retailers who use it.

15. The Wall Street Journal highlights the problem, stating:

> Some brands automatically add optional coverage to orders. ***Customers have complained the fees are disclosed in small fonts, made to appear mandatory when they are not or are displayed late in the online checkout process***.

Imani Moise, *Porch Pirates Are Now Raising the Price You Pay at Checkout*, Wall Street Journal, December 25, 2024, available at https://www.wsj.com/personal-finance/package-theft-hidden-fee-higher-prices-325c4a34?mod=Searchresults_pos3&page=1 (emphasis added).

16. Extend is aware that, by programming its widget to automatically opt in consumers to its "Shipping Protection" fees, most consumers will unknowingly purchase the protection, providing retailers with the "free money" Extend promises. Extend is further aware that, had it programmed its widget to offer optional Shipping Protection (requiring an opt-in), the vast majority of consumers would not purchase its service. This awareness resides with Extend's California-based executives and product team.

17. Worse, on information and belief, Extend's widget *automatically* opts consumers into additional shipping-related junk fees even when the e-commerce website at issue expressly and prominently promises that shipping is completely "free" or is a flat price.

## II. Extend Surreptitiously Adds Fees to Consumers' Carts

18. Here's how Extend's deception works. When a consumer views an item on the merchant website, the consumer is shown the price of the item. Then, when a consumer adds the item to their online shopping cart on the merchant's website, the consumer is informed that orders are entitled to free or flat rate shipping, usually depending on the purchase price.

19. As the consumer proceeds to checkout, the consumer is taken to their shopping cart, where they enter shipping information. At this stage, after the consumer has already committed to the transaction and entered personal information, Extend's widget inserts a Shipping Protection fee into the consumer's cart.

20. At the time Plaintiff and the putative Class members made their purchases, the "Extend Shipping Protection" checkbox displayed at checkout was *pre-selected*, and the Shipping Protection fee was *automatically* added to the consumer's cart. The prechecked box is tiny, intentionally designed to go unnoticed by consumers, and engineered to force consumers to affirmatively opt-out of the junk fee in order to avoid it. On information and belief, Extend's California-based product and design team chose every visual element of this interface, including the size, placement, and pre-selected state of the toggle.

21. The Shipping Protection fee appears only late in the checkout flow, after the consumer has entered shipping and payment information, at a time when consumers are least likely to scrutinize additional line items and most likely to proceed with the transaction as presented.

22. Thus, if consumers even notice a fee added to their transactions, consumers are still left entirely unaware that the added "Shipping Protection" fee charge is optional, because it is presented in the cart as a mandatory line item alongside taxes and other required charges.

23. This pre-selection and automatic opting in of consumers to junk fees is itself deceptive.

24. Extend does not clearly and conspicuously disclose the material terms of the Shipping Protection product—including that it is optional and what specific protections it provides beyond existing alternatives—before the consumer reaches the checkout stage.

25. As the FTC notes, "[f]or years, unscrupulous direct-mail and brick-and-mortar retailers have used design tricks and psychological tactics such as pre-checked boxes, hard-to-find- and read disclosures, and confusing cancellation policies, to get consumers to give up their money or data." *FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers, September 15, 2022* (available at https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers). The FTC further notes in its *Enforcement Policy Statement Regarding Negative Option Marketing* that **"[a] 'pre-checked box' does not constitute affirmative consent."** https://www.ftc.gov/system/files/documents/public_statements/1598063/negative_option_policy_statement-10-22-2021-tobureau.pdf at p. 13 (emphasis added).

## III. Extend's Widget Is Deployed Against a Backdrop of Free-Shipping Promises, Compounding Consumer Confusion

26. Extend's deceptive interface design and confusing nomenclature are especially harmful in the context of retailers that promise free shipping. When a consumer has been shown throughout her shopping experience that shipping is "free," any additional charge appearing at checkout—particularly one labeled "Shipping Protection" and formatted as a pre-checked line item alongside taxes and required charges—is even less likely to be understood as a voluntary, optional add-on. The free-shipping backdrop reinforces consumers' assumption that the "Shipping Protection" fee must be mandatory.

27. Extend decided that it could maximize revenue by deploying its auto-checked widget on retailers who were already promising consumers free shipping. Extend was aware that consumers who had been promised free shipping would be particularly unlikely to scrutinize additional line items at checkout, making them highly susceptible to the auto-checked "Shipping Protection" fee going unnoticed and unpaid.

28. Because it is well known that American consumers prefer free or low-cost shipping, Extend made an intentional decision to deploy its widget in this environment, exploiting consumers' expectations and the resulting inattention to additional line items to maximize the number of consumers who pay the fee without affirmatively choosing to do so.

## IV. Extend Confusingly Named the Add-On Fee "Shipping Protection" and Structured the Auto-Checked Default to Generate Revenue from Non-Consenting Consumers

29. Extend's choice to name its add-on fee "Shipping Protection" is itself a central element of the deception. The name "Shipping Protection" implies that the charge is a standard, mandatory cost of the shipping transaction—akin to postage or insurance required by the carrier—rather than an optional commercial add-on that most consumers would decline if offered a free and clear choice. Reasonable consumers presented with a line item labeled "Shipping Protection" in a cart that also includes taxes and required shipping charges would not understand that this fee is entirely optional.

30. The "Shipping Protection" label is further confusing because it does not disclose what specific protections the fee provides, who is actually selling the product, or what rights consumers are agreeing to waive. A consumer who encounters the charge would reasonably assume it was a mandatory fee imposed by the shipping carrier or required by the retailer—not an optional product sold by Extend, a third party the consumer has never heard of and whose terms were never disclosed.

31. Extend structured the auto-checked default specifically to generate revenue from consumers who would otherwise not choose to opt-in. Extend's own marketing materials acknowledge that the pre-selected default is essential to its revenue model: Extend promises retailers it will "maximize revenue" and deliver "almost free money," a result achievable only because consumers are charged without affirmatively choosing the product.

32. This structure deliberately exploits consumer inertia. Extend's California-based product team designed the widget with awareness that the vast majority of consumers do not change pre-selected defaults, particularly late in a checkout flow after they have already entered shipping and payment information. The pre-checked format was chosen precisely because it maximizes the number of consumers who pay without ever affirmatively deciding to do so.

33. The combination of the auto-checked default, the late-stage placement of the fee in the checkout flow, and the confusing "Shipping Protection" label creates a systemic mechanism for extracting fees from consumers without meaningful consent. Each element reinforces the others: the name makes consumers think the fee is required; the late-stage placement means consumers are least likely to scrutinize it; and the pre-check ensures that passive consumers are charged regardless. Reasonable consumers, like Plaintiff, would not knowingly choose to pay Extend's "Shipping Protection" fee absent Extend's deception. Had Extend offered the same product via a genuine opt-in mechanism, the overwhelming majority of consumers would decline it. The deceptive design is not incidental to Extend's business model; it is the business model.

## V. <u>**Defendant's Fees are Junk Fees and Violate Federal Guidance**</u>

34. Under federal law, Defendant's practice is called a "negative option", which is "'an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.'" 16 C.F.R. § 310.2(w). Negative options are routinely found to violate federal laws, including the Restore Online Shoppers' Confidence Act ("ROSCA").

35. Indeed, Defendant's shipping fees, such as the Shipping Protection fee, are precisely the type of "Junk Fee" that have come under government scrutiny in recent years:

> Junk fees are fees that are mandatory but not transparently disclosed to consumers. Consumers are lured in with the promise of a low price, but when they get to the register, they discover that price was never really available. Junk fees harm consumers and actively undermine competition by making it impractical for consumers to compare prices, a linchpin of our economic system.

The White House, The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition, March 5, 2024, available at https://bidenwhitehouse.archives.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/.

36. As the Federal Trade Commission said recently in its effort to combat Junk Fees:

> [M]any consumers said that sellers often do not advertise the total amount they will have to pay, and disclose fees only after they are well into completing the transaction. They also said that sellers often misrepresent or do not adequately disclose the nature or purpose of certain fees, leaving consumers wondering what they are paying for or if they are getting anything at all for the fee charged.

Federal Trade Commission, FTC Proposes Rule to Ban Junk Fees – Proposed rule would prohibit hidden and falsely advertised fees, October 11, 2023, available at https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees.

37. In July of 2024, California expanded its Consumer Legal Remedies Act ("CLRA") amending it to make "drip pricing," illegal, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service. California Civil Code Section 1770(a)(29). Under the new California law, it is now illegal to advertise a low price for a product,

only for that product to be subject to additional or mandatory fees later. In other words, "the price listed or advertised to the consumer must be the full price that the consumer is required to pay." See California Department of Justice, Office of the Attorney General, *SB 478 Frequently Asked Questions*, available at https://oag.ca.gov/system/files/attachments/press-docs/SB%20478%20FAQ%20%28B%29.pdf (last accessed July 18, 2024). As the California Department of Justice stated:

> Businesses are free to explain how they set their prices or to *subsequently* itemize the charges that make up the total price that they charge customers. However, the price they advertise or display must be the total price that customers will have to pay for the good or service. Knowing the price of a good of service is essential to competition, and displaying a price that is less than what the customer will actually be charged is deceptive.

*Id*. at p. 4 (emphasis added).

38. In its 2013 publication ".com Disclosures: How to Make Effective Disclosures in Digital Advertising," the FTC makes clear that when advertising and selling are combined on a website, and the consumer will be completing the transaction online, the disclosures should be provided before the consumer makes the decision to buy – for example, before the consumer "add[s] to shopping cart." See Fed. Trade Comm'n, .com Disclosures: How to Make Effective Disclosures iN Digital Advertising at ii, 14 (Mar. 2013), available at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf.

39. Defendant violates federal guidance and California law by adding the shipping fees as line items well after the consumer "add[s] to shopping cart," and by failing to disclose the nature of these fees.

## VI. Plaintiff's Experience

40. Plaintiff ordered goods from MidwayUSA's website on December 18, 2025, for a total of $367.98.

41. However, his purchase included a $7.35 charge for a "Shipping Protection" fee that was automatically and surreptitiously added to his cart. The fee was presented in a manner designed to blend in with required transaction costs.

42. Plaintiff did not know the charge existed or could be removed prior to his purchase.

43. Plaintiff would not have purchased Shipping Protection if he knew it was optional.

44. At no point during or before his December 18, 2025, MidwayUSA purchase was Plaintiff presented with, or did he agree to, Extend's Terms and Conditions or any arbitration clause in those Terms.

45. Plaintiff did not visit Extend's website, review Extend's Terms, or receive any disclosure identifying Extend's Terms or an arbitration provision in those Terms before or during his purchase. Extend's Terms were never hyperlinked, displayed, or otherwise presented to Plaintiff at any point in the checkout flow.

## CLASS ALLEGATIONS

46. Plaintiff brings this action on behalf of himself and a nationwide Class of all other similarly situated persons. The proposed Class is defined as:

> All consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, paid a Shipping Protection fee or other similar fee for a service provided by Extend.

47. In addition to the proposed nationwide Class, Plaintiff also brings this action on behalf of California and Alabama subclasses of the above-defined Class.

48. Excluded from the Classes are Defendant, any entities in which it has a controlling interest, any of its parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, and the presiding judge(s) in this case, and their staff. Plaintiff reserves the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon, *inter alia,* changing circumstances and/or new facts obtained during discovery.

49. Plaintiff reserves the right to modify or amend the definition of the proposed Classes and/or add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

50. The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual class members because Defendant has acted on

grounds generally applicable to the Classes. Such common legal or factual questions include, but are not limited to:

a. Whether Defendant's alleged misconduct misled or had the tendency to mislead consumers;

b. Whether Defendant engaged in unfair, unlawful, and/or fraudulent business practices under the laws asserted;

c. Whether Defendant's alleged conduct constitutes violations of the laws asserted;

d. Whether Plaintiff and members of the Classes were harmed by Defendant's misrepresentations;

e. Whether Defendant was unjustly enriched;

f. Whether Plaintiff and the Classes have been damaged, and if so, the proper measure of damages; and

g. Whether an injunction is necessary to prevent Defendant from continuing to engage in the wrongful conduct described herein.

51. The parties are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to Defendant's records. Defendant has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiff.

52. It is impracticable to bring Class members' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be

practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

53. Plaintiff's claims are typical of the claims of the other members of the Classes in that they arise out of the same wrongful business practices by Defendant, as described herein.

54. Plaintiff is a more than adequate representative of the Classes in that Plaintiff paid fees to Defendant and suffered damages as a result of Defendant's misrepresentations. In addition:

a) Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in the prosecution of consumer class actions;

b) There is no conflict of interest between Plaintiff and the unnamed members of the Classes;

c) Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d) Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

55. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

56. Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate corresponding declaratory relief with respect to the Classes as a whole.

57. All conditions precedent to bringing this action have been satisfied and/or waived.

## **<u>FIRST CLAIM FOR RELIEF</u>**
**Violation of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code § 17200, et seq.)**
**(On Behalf of Plaintiff and the Nationwide Class, or in the Alternative, the California Class)**

58. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

59. The deceptive acts or practices in the creation, implementation, and charging of Shipping Protection Fees originate from California. Extend is headquartered in San Francisco, California. Extend's decisions about widget design, fee naming, the pre-check default, and retailer

contracting were all made in California by California-based personnel. Thus, California law is applicable on a nationwide basis.

60. Defendant's conduct described herein violates the Unfair Competition Law ("UCL"), codified at California Business and Professions Code section 17200, *et seq*.

61. The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

62. The UCL imposes strict liability. Plaintiff need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

63. A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

64. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the public.

65. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

66. Defendant committed unfair and fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it affirmatively and knowingly (a) designed a widget interface that automatically pre-selects the Shipping Protection fee and presents it as a mandatory line item late in the checkout flow, sneaking it into consumers' carts without affirmative consent; (b) confusingly named the add-on fee "Shipping Protection," a label that leads reasonable consumers to believe the charge is required, standard, or imposed by the carrier, rather than an optional commercial add-on sold by Extend; and (c) structured the auto-checked default specifically to generate revenue from consumers who would otherwise not choose to opt-in, knowing that most consumers would not select the protection if presented with a genuine, neutral opt-in mechanism.

67. Defendant's acts and practices offend an established public policy of truthful advertising in the marketplace, and constitute immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

68. The harm to Plaintiff and the Classes outweighs the utility of Defendant's practices. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misleading and deceptive conduct described herein.

69. Defendant's conduct also constitutes an "unlawful" act under the UCL because it also constitutes a violation of sections of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code section 1750, *et seq.*as more thoroughly described below.

70. Extend's conduct also constitutes an "unlawful" act under the UCL because it constitutes a violation of ROSCA, 15 U.S.C. §§ 8401–8405. Specifically, Extend used "'negative option'" sales [that] took advantage of consumers' expectations." *Id.*, § 8401(8). Moreover, Extend violated ROSCA by using a negative option feature that (1) did not provide text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; and (2) did not obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction. *Id.*, § 8403(1), (2).

71. Defendant's business practices have misled Plaintiff and the proposed Classes and, unless enjoined, will continue to mislead them in the future.

72. Plaintiff relied on Defendant's misrepresentations in making his purchase. Specifically, Defendant (a) deceptively added fees into consumers' carts; (b) deceptively named and described the add-on fees; (c) charged Plaintiff and Class members for shipping above and beyond what was promised to them; and (d) charged fees that provide no added value to consumers and reasonable consumers, like Plaintiff, who would not knowingly choose to pay them, absent Defendant's deception.

73. As a direct and proximate result of Defendant's unfair, fraudulent, and unlawful practices, Plaintiff and Class members suffered and will continue to suffer actual damages.

Defendant's fraudulent conduct is ongoing and presents a continuing threat to Plaintiff and Class members that they will be deceived. Plaintiff desires to conduct further business with Defendant but cannot rely on Defendant's representations unless an injunction is issued.

74. As a result of its unfair, fraudulent, and unlawful conduct, Defendant has been unjustly enriched and should be required to disgorge its unjust profits and make restitution to Plaintiff and Class members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

75. Pursuant to Business & Professions Code §§ 17203 and 17500, Plaintiff and the members of the Classes, on behalf of the general public, seek an order Court enjoining Defendant from continuing to engage, use, or employ its unfair, unlawful, and fraudulent practices.

76. Plaintiff has no adequate remedy at law in part because Defendant continues to automatically add fees to all purchases. Plaintiff therefore seeks an injunction on behalf of the general public to prevent Defendant from continuing to engage in the deceptive and misleading practices described herein.

## <u>SECOND CLAIM FOR RELIEF</u>
**False and Misleading Advertising**
**(Bus. & Prof. Code §§ 17500, et seq.)**
**(On Behalf of Plaintiff and the Nationwide Class, or in the Alternative, the California Class)**

77. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

78. California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code section 17500, states that "[i]t is unlawful for any . . . corporation . . . with intent . . . to dispose of . . . personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."

79. Defendant's material misrepresentations and omissions alleged herein violate Business and Professions Code section 17500.

80. Defendant knew or should have known that its misrepresentations and omissions were false, deceptive, and misleading.

81. Pursuant to Business and Professions Code sections 17203 and 17500, Plaintiff and the members of the Classes, on behalf of the general public, seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its deceptive practices.

82. Further, Plaintiff requests an order awarding Plaintiff and Class members restitution of the money wrongfully acquired by Defendant by means of said misrepresentations.

83. Additionally, Plaintiff and Class members seek an order requiring Defendant to pay attorneys' fees pursuant to California Civil Code section 1021.5.

**<u>THIRD CLAIM FOR RELIEF</u>**
**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**(Cal. Civ. Code § 1750, et seq.)**
**(On Behalf of Plaintiff and the Nationwide Class, or in the Alternative, the California Class)**

84. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

85. This cause of action is brought pursuant to the Consumers Legal Remedies Act (CLRA), California Civil Code § 1750, *et seq*. Plaintiff and each member of the proposed Classes are "consumers" as defined by California Civil Code § 1761(d). Defendant's sale of merchandise and shipping insurance to consumers were "transactions" within the meaning of California Civil Code § 1761(e). The merchandise purchased by Plaintiff and the Classes are "goods" within the meaning of California Civil Code § 1761(a).

86. Extend's Shipping Protection fee constitutes a "service" furnished in connection with the sale of goods within the meaning of California Civil Code § 1761(b), which defines "services" to include "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." Extend's Shipping Protection is assessed as an add-on to consumers' purchases of tangible merchandise (goods) from e-commerce retailers; it is inseparable from the underlying goods transaction. It is a service fee assessed within, and as a part of, the checkout process for the purchase of consumer goods.

87. Defendant violated and continues to violate the CLRA by engaging in the following

practices proscribed by California Civil Code § 1770(a) in transactions with Plaintiff and the Classes which were intended to result in, and did result in, the sale of merchandise:

a. "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

b. "Representing that goods or services have . . . characteristics . . . that they do not have" (a)(5);

c. "Advertising goods or services with intent not to sell them as advertised" (a)(9);

d. "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14)

e. "Advertising that a product is being offered at a specific price plus a specific percentage of that price unless (A) the total price is set forth in the advertisement, which may include, but is not limited to, shelf tags, displays, and media advertising, in a size larger than any other price in that advertisement, and (B) the specific price plus a specific percentage of that price represents a markup from the seller's costs or from the wholesale price of the product" (a)(20); and

f. "Advertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges" (a)(29).

88. More than 30 days before filing this First Amended Complaint, Plaintiff's counsel notified Defendant in writing by certified mail of the particular violations of § 1770 of the CLRA and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to act. Defendant has failed to respond to Plaintiff's letter or agree to rectify the problems associated with the actions detailed above within 30 days of the date of written notice, as required by § 1782. Accordingly, Plaintiff now seeks actual, punitive, and statutory damages in addition to injunctive relief pursuant to § 1780.

89. Plaintiff also seeks public injunctive relief, as described above.

## FOURTH CLAIM FOR RELIEF

**Violations of Alabama's Deceptive Trade Practices Act**
**(Ala. Code §§ 8-19-1, et seq.)**
**(On Behalf of Plaintiff)**

90. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

91. Defendant is a "person" as defined by Ala. Code § 8-19-3(5).

92. Plaintiff is a "consumer" as defined by Ala. Code § 8-19-3(2).

93. Defendant advertised, offered, or sold goods or services in Alabama, and engaged in trade or commerce directly or indirectly affecting the people of Alabama.

94. Defendant engaged in deceptive acts and practices in the conduct of trade or commerce in violation of the Alabama Deceptive Trade Practices Act, including: (1) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have; (2) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (3) engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce, including acts and practices that would violate Section 5(a)(1) of the FTC Act, as interpreted by the FTC and federal courts.

95. Specifically, Defendant (a) snuck fees into consumers' shopping carts through its widget interface design, which automatically pre-selected the charge and presented it as a mandatory line item without consumers' affirmative consent; (b) confusingly named the add-on fee "Shipping Protection" in a manner reasonably likely to lead consumers to believe the charge was required, standard, or carrier-imposed rather than an optional commercial product; and (c) structured the auto-checked default specifically to generate revenue from consumers who would otherwise not choose to opt-in, exploiting consumer inertia rather than securing genuine consent.

96. Consumers cannot reasonably avoid any of these injuries caused by Defendant's unfair and deceptive conduct because, on information and belief, when consumers make their purchase, the "Extend Shipping Protection" checkbox displayed on the order screen is pre-selected, and the Shipping Protection fee is automatically added to the consumer's cart. The prechecked box

is tiny, intentionally designed to go unnoticed by consumers, and engineered to force consumers to affirmatively opt-out of the junk fee in order to avoid it.

97. Defendant knew or should have known that its misrepresentations and omissions were false, deceptive, and misleading.

98. The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and the Class that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition, if any exist.

99. Defendant acted intentionally, knowingly, and maliciously to violate Alabama's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff's rights. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the true cost of the goods and services they purchased from online merchants.

100. As a direct and proximate result of Defendant's unfair, unlawful, and deceptive trade practices, Plaintiff has suffered and will continue to suffer injury and damages. Plaintiff and the Class seek all monetary and non-monetary relief allowed by law, including, pursuant to § 8-19-10(1), the greater of (a) actual damages or (b) statutory damages of $100; treble damages; injunctive relief; attorneys' fees, costs, and any other relief that is just and proper.

## FIFTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class)**

101. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

102. To the detriment of Plaintiff and the Classes, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

103. Plaintiff and the Classes conferred a benefit on Defendant.

104. Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Defendant to retain.

105. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

106. Plaintiff and the Classes, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, demands a jury trial on all claims so triable and judgment as follows:

(a) Certification for this matter to proceed as a class action on behalf of the Classes;

(b) For declaratory and injunctive relief as set forth above;

(c) For an order requiring Defendant to disgorge and make restitution of all monies it acquired by means of the unlawful practices set forth above;

(d) For compensatory damages according to proof;

(e) For punitive damages according to proof;

(f) For reasonable attorneys' fees and costs of suit;

(g) For pre-judgment interest; and

(h) Awarding such other and further relief as this Court deems just, proper and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: July 6, 2026

**KALIELGOLD PLLC**

By: */s/ Amanda J. Rosenberg*
Amanda J. Rosenberg
Jeffrey D. Kaliel
Sophia G. Gold

*Attorneys for Plaintiff and the Putative Classes*